# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Aug 16, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  23   MJ   140 |
| Information associated with Facebook ID: 100004126687957, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2119; 924(c); 844 (i); 844(h), and 371 | Carjacking; Use of a firearm during the commission of a violent crime; Use of fire to damage property affecting interstate commerce; Use of fire in furtherance of a federal felony, and Conspiracy. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Rick Hankins, ATF SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date: 8/16/2023

*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure authority.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin

1

and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 300 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,600 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 223 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5.     This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

6.     Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device.

2

7.      During the course of my career, I have conducted criminal investigations involving the use of social media.  Additionally, I have received training and instruction regarding the use of social media sites by criminal elements.  I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects.  Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website.  The "instant message" / "in-box message" is a private communication from one user to another.  Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others.  Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as narcotics, unexplained large amounts of cash, and firearms.  Also, suspects in criminal investigations have been known to post statements and/or lyrics on social websites referencing their own criminal activity.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 18 U.S.C. §§ 371 (conspiracy), have been committed by multiple co-conspirators, more specifically for this affidavit, Alfredo ACOSTA.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

3

## **TARGET ACCOUNTS TO BE SEARCHED**

Facebook account showing vanity name "Alfredo Acosta" with Facebook ID ##100004126687957.

## **PROBABLE CAUSE**

9.      On February 19, 2023, at approximately 5:43AM, the Milwaukee Police Department responded to a shooting near 1727 West Mineral Street, Milwaukee, Wisconsin (**"Location 1"**).  Upon their arrival, police subsequently located Alfredo ACOSTA, who had been shot multiple times.  ACOSTA was found lying on the front porch of XXXX South 18th Street and transported to a hospital.

10.      The Milwaukee Police Department later interviewed ACOSTA who stated he and his friend, C.B., were at Potawatomi Casino and then went to a party near South 34th Street and West Pierce Street in Milwaukee (**"Location 2"**).  ACOSTA said he was driving a Chrysler 300 car that had been rented by his brother, who was later identified as M.A.  As he and C.B. left the party and were walking to the Chrysler 300, ACOSTA said they were approached by 5 unknown black males wearing ski masks and carrying firearms.  ACOSTA stated he was struck multiple times in the head by the suspects' firearms while the suspects demanded to know where "the money was."  ACOSTA stated he told the suspects he did not know what they were talking about.  ACOSTA further said the suspects went through his pockets and took his money, necklace, grills, cellphone [phone # (262) 283-2021], and keys to the Chrysler 300 rental car. ACOSTA said he and C.B. were then forced at gunpoint into the suspects' white SUV. ACOSTA stated the suspects drove him and C.B. to C.B.'s address after C.B. provided his address.  ACOSTA said the suspects exited the SUV at one point, at which time he exited the

4

SUV and attempted to run away. ACOSTA stated he heard multiple gunshots and was struck multiple times in his leg, ankle, and foot. ACOSTA believed C.B. was targeted for the robbery because C.B. has posted social media videos in which C.B. had flashed a lot of money.

11.     The Milwaukee Police Department also interviewed C.B, who was located at his residence - XXXX West Mineral Street. C.B. stated he posted a message on Facebook on February 18, 2023, asking if anyone wanted to go out. C.B. said he received a phone call from ACOSTA, who he has known since high school. C.B. stated he and ACOSTA made plans to go out together. C.B. said ACOSTA picked him up in a 4-door Chrysler rental car. C.B. stated he, ACOSTA, and their friend M.H. first went to Element Nightclub in downtown Milwaukee and then to Potawatomi Casino. While at the casino, C.B. stated he received a phone call from a female he knew as "Pat" who invited him to a party near South 34th Street and West Pierce Street in Milwaukee. C.B. further said he is friends with "Pat" on social media. C.B. stated he and ACOSTA dropped Michael at home before going to the party. C.B. said he and ACOSTA stayed at the party for approximately 45-60 minutes and then left. As they were approaching ACOSTA'S Chrysler rental car, C.B. said two unknown vehicles stopped by them and five unknown male suspects (suspects) exited one of the vehicles. All five were wearing masks. C.B. further said the masked suspects pointed firearms at C.B. and ACOSTA and C.B. was struck in the head with firearms prior to being forced into the suspect vehicle. C.B. said the suspects went through his pockets and took $200 cash and his Apple iPhone. C.B. said the suspects asked where they lived and C.B. provided his home address – XXXX West Mineral Street. C.B. further said ACOSTA fled the vehicle when they arrived at his address, so he also fled from the vehicle, ran into XXXX West Mineral Street, and did not come out until police arrived.

5

12.     The Milwaukee Police Department recovered (24) 9mm ammunition casings from the shooting scene near 1727 West Mineral Street.

13.     On February 19, 2023, at approximately 6:45AM, the Milwaukee Police and Fire Departments responded to a vehicle fire at 227 East Townsend Street, Milwaukee, Wisconsin (**"Location 3"**).  The burned vehicle was identified as a 2020 grey Chrysler 300 with WI license plate #11294AFT (VIN # 2C3CCAGG3LH146281), which was the same vehicle rented on February 18, 2023, by M.A. from Enterprise Car Rental located 5300 South Howell Avenue in Milwaukee, Wisconsin.  A 911 caller stated they observed a black male suspect standing near the vehicle within seconds of the vehicle being engulfed in flames. The black male was wearing black clothing with a black face mask. Under these circumstances, I believe the rental car was a vehicle used in interstate commerce that was intentionally destroyed by means of fire.

14.     On February 28, 2023, ATF interviewed C.B. and C.B. stated the party near 34th Street and Pierce Street was held inside a photography studio on the first floor of a commercial building.  C.B. used digital Google Streetview images on Your Affiant's cellphone and initially identified 3530 West Pierce Street as the building where the party was held.  Additionally, C.B. said an unknown Hispanic male traveled with C.B. and ACOSTA to the party.  C.B. stated the unknown Hispanic male was an associate of ACOSTA who they ran into earlier that same night.

15.     Also on February 28, 2023, ATF Agents canvassed the area of 3530 West Pierce Street and found that address to be a U-Haul self-storage building.  ATF Agents then contacted a remodeling construction crew that working at the commercial building located at 3600 West Pierce Street.  The construction crew stated that 3600 West Pierce Street had a photography studio on the first floor, which was unlocked and open.  ATF Agent also contacted a resident at XXXX South 36th Street who had exterior surveillance cameras that faced toward the

6

intersection of West Pierce Street and South 36th Street, and also captured the front door of 3600 West Pierce. Agents viewed the surveillance video from February 19, 2023, and observed the 2020 Chrysler 300 arrive at approximately 4:36AM and park immediately across the street from the front door of 3600 West Pierce Street. Three individuals exited the Chrysler and subsequently entered 3600 West Pierce Street. The surveillance video also captured a white Jeep SUV travel by 3600 West Pierce Street on three occasions between 4:43AM and 4:46AM. What appeared to be the same white Jeep SUV backed into the north/south alley between 3600 West Pierce Street and 3530 West Pierce Street at approximately 4:54AM. The surveillance camera showed C.B., ACOSTA, and the unknown male exit 3600 West Pierce Street at approximately 5:17AM and walk to the Chrysler 300. ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video showed suspects remove the shirt from C.B. and leave it in the road. The video further showed C.B., and ACOSTA were ushered by the suspects into the white Jeep SUV while the unknown third male appeared to be placed in the Chrysler 300. The white Jeep SUV then traveled south on South 36th Street followed by the Chrysler 300, which was presumably driven by a suspect.

16.    On March 1, 2023, ATF interviewed Alfredo ACOSTA. ACOSTA offered the following summary of the evening that led up to his shooting:

17.    ACOSTA stated he picked up C.B. and M.H. at C.B.'s house and they all went to Element night club and bar hopped. When he and C.B. left leaving an afterparty later that night, ACOSTA stated that 5-6 guys wearing masks rushed them and placed them in a suspect vehicle. Your Affiant asked ACOSTA what happened to the 3rd male in his vehicle that was also at the

7

afterparty. ACOSTA said he didn't recall a 3rd person in his vehicle that went to the afterparty with him and C.B. After the robbery, ACOSTA stated that the mother of his children called his cellphone number to see if he could retrieve his belongings. ACOSTA said the calls would keep ringing with no answer. While in the suspect's car, ACOSTA said he was thinking of ways to get out of the situation. When the suspects subsequently got out of the vehicle, ACOSTA said he saw his opportunity, so he got out and ran. ACOSTA stated the suspects chased him and he heard several gunshots and was hit 5 times. ACOSTA said that the suspects drove to C.B.'s house and parked near the middle of the street and he heard something about another car being there. ACOSTA said the driver and front passenger got out of the suspect vehicle and is not sure where they went. ACOSTA further stated that suspect seated next to him in the backseat later climbed into the driver seat after a vehicle passed by the suspect vehicle. ACOSTA said the backseat suspect that had climbed into the driver seat pulled the vehicle forward and honked the horn (because of the unknown vehicle that passed by), at which time the two suspects that had exited the suspect vehicle ran back to the vehicle. ACOSTA stated he jumped out of the backseat as the two suspects were returning to the vehicle. ACOSTA said after he fell to the ground from being shot, he got back up and ran on a broken ankle and hid under someone's porch. Acosta said he subsequently knocked on a door and asked them to call an ambulance. ACOSTA said the suspects had asked for a specific wristwatch owned by ACOSTA that ACOSTA was not wearing on the night of the robbery. When asked, ACOSTA said he has worn that wristwatch in photographs that he posted to Facebook. ACOSTA stated his Facebook profile name was "Alfredo Acosta" and included an image of him turned away from the camera. Acosta further said his Facebook account was open on his cellphone when the suspects took it. Your Affiant later located ACOSTA's Facebook account through open search and observed

8

ACOSTA's profile image (Facebook ID #100004126687957). ACOSTA said he, C.B., and M.H. also went Potawatomi Casino on the night of the robbery. ACOSTA said C.B. and M.H. went into the casino while ACOSTA went to drop off a girl he had met at Silk nightclub.

18.     Based on my training and experience, individuals carry their cellular phones on their person or in a very close vicinity whether it is day or night. Further, most individuals have their own cellular phones, so it is likely the subject(s) cellular phone is using and/or registering with the cellular tower providing service in the general geographic area of the crime.

19.     On March 9, 2023, Your Affiant received records from T-Mobile related to Federal search warrant #23-M-303. The records included Timing advance "True Call" data related to devices that were within the vicinity of the four aforementioned crime locations in Milwaukee, those being 3600 W. Pierce Street (Location 2), 1727 W. Mineral Street (Location 1), 227 East Townsend Street (Location 3), and the West Allis shooting location at 7527 West Becher Street (Location 4). Based on the aforementioned query of T-Mobile data and subsequent analysis, the following cellphone number was found to be in the area of locations #1, #2, and #4: (414) 975-7826.

20.     The account for (414) 975-7826 is listed to KENTREAL EVANS at 3618 North 14th Street, Milwaukee, WI 53206 with an activation date of November 29, 2022. This account was terminated on March 11, 2023.

21.     A review of the T-Mobile timing advance data for (414) 975-7826 for January 3, 2023, showed that this cellphone device was in the area of South 76th Street and West Becher Street in West Allis at or near the time of a reported shooting on that date at approximately 2:00PM. The recorded movement of cellphone number (414) 975-7826 showed it arrived in the shooting area between 1:58-1:59PM and then traveled away from that area.

9

22. A review of the T-Mobile timing advance data for (414) 975-7826 for February 19, 2023, showed that this cellular device was in the area of 3600 West Pierce Street, Milwaukee, Wisconsin from approximately 4:42AM to approximately 5:19AM, when it moved away from that area. Specifically, the timing advance data estimated this IMSI # was in close proximity to 3600 West Pierce Street from approximately 4:57AM until the IMSI# appeared to move from the area at 5:19AM. T-Mobile placed estimated locations for this IMSI# to be near where the suspect white Jeep SUV was parked at the time of the robbery.

23. After cellphone (414) 975-7826 left the area of 3600 West Pierce Street, it traveled briefly to the north side of I-94 and then traveled to the southside of I-94. According to T-Mobile records, this cellphone device was reported to be at or near 1621 South 24th Street at 5:32AM and was located at or near 1900 West Bruce Street at 5:37AM. The below diagram depicts the proximity of the two aforementioned locations as they relate to the location of a shooting at 1727 West Mineral Street that was reported at approximately 5:43AM.



24.     A query of the address 3618 North 14th Street, Milwaukee, Wisconsin showed a listed resident as Kentreal Tommie Lee EVANS (B/M, DOB: 5/11/2001).  EVANS is on active Wisconsin DOC supervision from a 2018 Milwaukee County felony conviction for driving a vehicle without consent, and EVANS' listed address is 3618 North 14th Street.

25.     A query of Wisconsin DOC archived inmate recorded calls showed that EVANS placed multiple calls to the following two numbers while he was incarcerated in 2022: (262) 676-8174 and (414) 369-0531.  T-Mobile call detail records for (414) 975-7826 showed multiple contacts with those same two numbers, which leads Your Affiant to further believe EVANS was likely in possession of (414) 975-7826 on February 19, 2023.

26.     A review of the call detail records provided by T-Mobile showed that cellphone number (414) 975-7826 [EVANS] had multiple contacts with cellphone number (414) 526-1156 on February 18, 2023, and (414) 788-9051.  A further review of the call detail records also showed EVANS had contacts with cellphone number (414) 309-9038.

27.     T-Mobile tower dump records showed that (414) 526-1156 called (414) 397-2342 at 4:40AM and 4:57AM on February 23, 2023, while (414) 397-2342 was at or near 3600 West Pierce Street.

28.     Your Affiant queried the Wisconsin Department of Corrections (DOC) Inmate Solutions online system for potential calls placed by inmates to (414) 526-1156 in an attempt to identify the possessor of that cellphone number.  Your Affiant located multiple phone calls placed by multiple Wisconsin DOC inmates to (414) 526-1156 between the queried dates 12/01/2022 – 4/18/2023.  The Wisconsin DOC Inmate Solutions system showed that (414) 526-1156 was associated with Geo OWENS, 4151 North 12th Street, Milwaukee, Wisconsin based on payment history for inmate calls.

11

29.     Your Affiant further reviewed recorded Milwaukee County Jail calls and located a call placed by inmate #2022007557 on January 17, 2023, at 1:34PM to (414) 526-1156.  In that call, the inmate referred to the male who answered the phone as "Geo".  Your Affiant also obtained records from AT&T related to Federal search warrant #23-889M related to (414) 526-1156.  According to AT&T records, (414) 526-1156 is registered to a "Rick James" at 4919 West Capitol Drive, Milwaukee, Wisconsin.  A query of that name and address did not produce results.  The email linked to the AT&T account is WUZYMOO@yahoo.com, which is an email associated with Geo OWENS (DOB:10/15/1997) according to a query of the law enforcement database TLO.  The AT&T account has been active since June 11, 2021.  The IMSI associated with the account is 310410360534308 and it is reportedly an iPhone 13.

30.     Based on the aforementioned, I believed (414) 526-1156 to be possessed by Geo OWENS on February 19, 2023.

31.     ATF later queried the Wisconsin Department of Corrections (DOC) Inmate Solutions online system for potential calls placed by inmates to cellphone number (414) 526-1156, which is a number associated with Geo OWENS. ATF located numerous calls placed by inmate Demario Bell to (414) 526-1156 in February – March 2023.  On March 12, 2023, Demario Bell placed a recorded jail call to a female at (414) 243-4065 in which Bell asked the female for "Geo's new number".  The female provided Geo's new number as (305) 342-6049.  After which inmate Bell did not place any additional calls to (414) 526-1156.  An additional query of the Inmate Solutions online system showed that inmate Jhony MARCHENA called (305) 342-6049 on May 18, 2023, at 10:36AM.  In that recorded call, the male who answered MARCHENA'S call informed MARCHENA that the male had a pretrial hearing on that same

date at 1:30PM.  According to court records, Geo OWENS had a court hearing in Milwaukee County at approximately 1:30PM on May 18, 2023.

32.     Based on the above paragraph, I believe that Geo OWENS discontinued the use of cellphone number (414) 526-1156 sometime in early March 2023 and began using cellphone number (305) 342-6049.

33.     Your Affiant also queried number (414) 309-9038 in TLO, which is an online law enforcement database after this number was found to be in the call detail records for 414-975-7826 during the matters under investigation on February 19, 2023.  TLO search results showed that number (414) 309-9038 was associated with Jhony MARCHENA (DOB: 2/23/2002) at 3402 North 23rd Street, Milwaukee, Wisconsin. Your Affiant further reviewed a recorded DOC call placed by inmate #666785 to (414) 309-9038 at 12:43PM on January 19, 2023, and a male answered the call.  In that call, the male explained to the inmate that the male had court on that same date and that he was trying to combine his criminal cases so that he could get a combined sentence.  A query of Wisconsin CCAP showed that Jhony MARCHENA was in Milwaukee Circuit Court on January 19, 2023, regarding two separate open felony cases: 2022CF003603 (unlawful possession of a firearm, bail jumping, and possession of THC with intent), and 2022CF002146 (unlawful possession of a firearm and resisting arrest).

34.     Based on the aforementioned, I believe cellphone number (414) 309-9038 was likely possessed by Jhony MARCHENA on February 19, 2023.

35.     On June 1, 2023, ATF executed Federal Search Warrant #23-MJ-122 at the residence of Jhony MARCHENA located at 9070 North 86th Street, Milwaukee, Wisconsin, which was signed by Magistrate Judge William Duffin.  ATF located an iPhone 13 Pro Max with the ID of Jhony MARCHENA.  The data extraction of the iPhone 13 Pro Max was initiated by

13

Waukesha Police Department Detective David Feyen on or about June 9, 2023, pursuant to Federal Search Warrant #23-M-380 signed by Magistrate Stephen Dries.

36.     The following is a summary of information located on the iPhone 13 Pro Max cellphone (ATF Item #40) located with MARCHENA'S ID:

37.     The cellphone data showed it was activated with cellphone number (414) 309-9038 and included IMSI #311480724551071.  The cellphone data also showed it was linked to Apple iCloud account ljames22356@icloud.com.  Additionally, the data showed the iPhone was associated with the following Instagram account: Thousand_8GRAMZ.

38.     The data extraction also showed that MARCHENA'S iPhone 13 Pro Max had been used to access the following Facebook account: "Jayy RackedUp" with Facebook ID #100040453024988.  A review of publicly available images posted to "Jayy Racked Up" showed multiple images that matched the likeness of Jhony MARCHENA.  Specifically, there was an image posted on February 19, 2023, of Jhony MARCHENA as he appeared to sit inside a vehicle.

39.     The contact list on MARCHENA'S iPhone 13 Pro Max included the following:

"Trelly" – (414) 975-7826 [Previously associated with Kentreal EVANS]

"Gts G" – (414) 526-1156 [Previously associated with Geo OWENS]

"Gee" – (305) 342-6049 [Previously associated with Geo OWENS]

"Lil Tre" – (414) 788-9051

"Lil Tre" – (414) 779-2527, which was created on 2/6/2023

"Quis" – (414) 397-2342, which was created on 12/30/2022

"Quis" – (414) 779-7848, which was created on 2/24/2023

"Fredo2" – (262) 283-2021, which was created on 1/16/2023

14

40.    The contact list from the iPhone included the following Facebook and Instagram friends:

"Alfredo Acosta" – Facebook ID #100004126687957

"fredo_100" – Instagram ID #414923653

"Lilg Globaltrapstar" – Facebook ID #100000147312664

(A review of publicly available images posted to "Lilg Globaltrapstar" showed it to be an account associated with Geo OWENS as it matched his likeness compared to a Milwaukee Police Department booking photograph)

41.    Your Affiant also reviewed the text messages on MARCHENA'S iPhone and found the texts message between his iPhone and "Gee" date back to March 2, 2023. On April 6, 2023, Jhony MARCHENA'S iPhone sent a text to Gee asking how much money MARCHENA should borrow and submit as a downpayment. Gee (Geo OWENS) responded by instructing MARCHENA to borrow $100,000 and put down $15,000. On April 7, 2023, OWENS texted MARCHENA and told MARCHENA that OWENS would pay for MARCHENA to setup an LLC.   Further search of MARCHENA'S cellphone showed a text message string between MARCHENA and a contact named "Ibree" / (262) 595-9423, which is a number associated with Ibriea "Ibree" Stewart in the law enforcement database TLO. According to open records, Stewart is a realtor for Berkshire Hathaway in the Milwaukee area. During his text messages with Stewart, MARCHENA asks Stewart what numbers he should be putting on his application. Stewart suggests that MARCHENA ask "Gee" what numbers should be used.

42.    The following is a summary of text communications between MARCHENA, and the cellphone possessed by Geo OWENS / (305) 342-6049:

15

43.     On March 4, 2023, OWENS texted MARCHENA from his (305) 342-6049 number, "wanna take me to Serv haul".  I know from training and experience that the term "serv / serve" is used to describe the selling of narcotics.  MARCHENA responded to OWENS by agreeing to pick him up and MARCHENA texted OWENS when he arrived at OWENS' location.  On March 31, 2023, MARCHENA was in text communication with OWENS regarding the attempted purchase by OWENS of unknown items from an unknown male.  The following is a summary of that communication:

> MARCHENA – "He said 4 for 100 a g for all of em he took 200 off he said"
>
> OWENS – "800 for all of em & we gone"
>
> MARCHENA – "Imma call em rn"
>
> MARCHENA – "He said 800$ and a zap he old nigga he'll take some cookie"
>
> OWENS – "Ok"

44.     I know from training and experience that the word "cookie" is a street slang term sometimes used for crack cocaine.

45.     OWENS also texted MLS listings to MARCHENA regarding properties for sale.  At one point, OWENS instructed MARCHENA to check his email.  This text exchange between OWENS and MARCHENA is believed to be related to an apparent conspiracy to commit mortgage fraud that is further detailed later in this affidavit when Your Affiant summarizes recorded jail calls between MARCHENA and OWENS.

46.     Your Affiant further reviewed text messages between MARCHENA and Kentreal EVANS aka "Trelly" at (414) 975-7826.  The text message history between MARCHENA and EVANS' number (414) 975-7826 dated back to 2/19/2023 at 2:15PM.

47.     The text history between MARCHENA and EVANS included an exchange that occurred on 2/25/2023 in which MARCHENA asked EVANS his whereabout because MARCHENA had a "move" for EVANS, which appeared to be a reference to a potential robbery.  MARCHENA proceeded to send EVANS a location pin for an unknown location.  MARCHENA further explained that he observed a guy in a barbershop with "gs" on him.  The term "gs" is a reference to thousands of dollars.  MARCHENA then told EVANS that it was "Trunk Time".  MARCHENA instructed EVANS to respond to his location, and based on the text exchange, it appeared that EVANS did show up to that location by saying "We here".  MARCHENA also said the target of the apparent robbery was driving an Acura truck and also provided the location where that truck was parked.  MARCHENA further said he believed there to be 1-2 people in the Acura truck and continued to provide EVANS with surveillance updates.  MARCHENA again sent EVANS a location pin for an apparent potential robbery at approximately 1:15AM on 2/26/2023.  MARCHENA referenced seeing people with "chains" as well as "smacks in whips", which is likely a reference to drugs in cars.

48.     The data from MARCHENA'S cellphone also included an audio clip of a rap song entitled "Thousand8-Trap Homes" that MARCHENA sent to "Fredo2" on January 16, 2023.  The rap song is sung by MARCHENA and includes lyrics that reference stealing, robbing, and pulling up in Jeeps.  The song also includes references to Glocks with switches and how when you shoot a Glock with a switch you cannot miss.

49.     MARCHENA'S cellphone data also included a Note created on 2/21/2023 at 9:39PM that appeared to be draft lyrics for a rap song.  The rap lyrics included references to jumping out on people while wearing masks and carrying Glocks with switches.  MARCHENA also created a Note on 1/20/2023 with apparent draft rap lyrics that included the phrase, "We

17

ain't just rappin bitch yea we living all this shit" "And don't pass me no Glock unless that bitch gotta switch".

50.　　Your Affiant also located data on MARCHENA'S cellphone that indicated he used the Telegram application for some communications regarding narcotics. The cellphone also includes multiple contacts via Instagram with apparent marijuana distributors, including "Thrive Exotics".

51.　　The text message history on MARCHENA'S cellphone included a message from a contact named "Lil Mone" / (414) 885-9551 on 2/13/2023 at 9:59AM in which Lil Mone asked MARCHENA, "Wat u got for Beamer u be bs". MARCHENA later replied at 10:13PM, "Lil bro n nem damn near gon have Strike for u bro just bought srt Jeep from them."

52.　　The cellphone also included a text message on 2/17/2023 at 9:24AM from a contact named "Xo" / (414) 937-1247 to MARCHENA in which Xo stated, "Get on yo people for that Jeep too I need one".

53.　　The cellphone further included text message on 3/19/2023 between MARCHENA and a contact named "Mohamed 100k At Poto" / (262) 527-5764 in which MARCHENA offered girls for sale to Mohamed and included photos of the girls. MARCHENA also said he had multiple types of girls for various prices.

54.　　The following is a summary of data from MARCHENA'S cellphone related to "Activity Sensor Data", "Password" entries, and "Log Entries". The Activity Sensor data is recorded movement of the iPhone that is registered in steps and distance traveled between specific sequential timestamps. This data is an estimation of how many steps the possessor of the iPhone has taken since the previous timestamp. Log Entries include timestamps of Facetime calls, and Password entries include timestamps of when the user entered their iPhone password.

18

55.     The following is an event timeline summary based on data downloaded from

MARCHENA's cellphone:

***All times are for February 19, 2023***

4:48:11AM –   MARCHENA'S cellphone registered he had taken approximately 48 steps since the last timestamp at 4:37:36AM.

4:54AM –   *Surveillance video captured the suspect white Jeep SUV parked in the alley next to 3600 West Pierce Street.*

5:04:23AM –   MARCHENA'S cellphone registered he had taken approximately 18 steps since the last timestamp at 4:48:11AM.

5:18AM –   *Surveillance video captured four suspects from the white Jeep SUV run toward the carjacking victims outside 3600 West Pierce Street.*

5:18:25AM –   MARCHENA'S cellphone registered he had taken approximately 178 steps since the last timestamp at 5:04:23AM.

5:19AM –   *Surveillance video captured two carjacking victims placed inside the white Jeep SUV and driven away while another robbery suspect entered the victim Chrysler 300 and drove that vehicle away.*

5:19:50AM –   MARCHENA had a 117 second Facetime call.

5:22:06AM –   MARCHENA placed an outgoing cellphone call for 52 seconds.

5:23:14AM –    MARCHENA received an incoming call from "Gts G" (OWENS).

5:23:23AM –   MARCHENA had a 34 second Facetime call.

5:24:02AM –   MARCHENA's cellphone password was entered to pair the cellphone to an unknown vehicle Uconnect software system via Apple carplay. Uconnect is a software platform that can be found in the following vehicles: Chrysler, Dodge, Jeep, Wagoneer, Ram, and FIAT.

5:30:25AM –   MARCHENA'S cellphone registered he had taken approximately 72 steps since the last timestamp at 5:18:25AM.

5:30:32AM –   MARCHENA had a 72 second Facetime call.

5:34:55AM –   MARCHENA had an almost 4-minute Facetime call.

5:42:00AM –   MARCHENA had a 23 second Facetime call.

19

5:42:20AM – MARCHENA had an incoming call from "Tre."

5:42:28AM – MARCHENA had a 14 second Facetime call.

5:43:34AM – MARCHENA had a 146 second Facetime call.

5:45:57AM – MARCHENA had a 13 second Facetime call.

5:51:21AM – MARCHENA had a 25 second Facetime call.

5:51:44AM – MARCHENA had a 16 second Facetime call.

5:52:04AM – MARCHENA had an incoming call from "Tre."

56. Your Affiant reviewed records from T-Mobile that were previously obtained pursuant to Federal search warrant #23-890M related to cellphone number (414) 397-2342. The records review revealed that Alfredo ACOSTA may have possessed phone number (414) 397-2342 for a period of time on February 19, 2023, as further detailed below, but that number was also possessed by another person:

57. Analysis of the T-Mobile Timing Advance data obtained for that cellphone number (ATF Item #26) showed that that number arrived at or near Potawatomi Casino at approximately 2:44AM on February 19, 2023, and then moved to the area of 1810 West Wisconsin Avenue by approximately 2:48AM until it returned to the area of Potawatomi Casino by approximately 3:05AM and then traveled to the area of 1810 West Wisconsin Avenue. Cellphone number (414) 397-2342 stayed in the area of 1810 West Wisconsin Avenue until approximately 3:55AM and it became mobile and later arrived at or near the casino at approximately 3:56AM. The phone number then traveled away from the casino at or about 3:57AM. In their separate interviews, M.H., C.B. and Alfredo ACOSTA all stated that ACOSTA had dropped off the group at the casino, left and then returned to the casino. The movement of (414) 397-2342 to and from the casino on February 19, 2023, is consistent with

20

that number being possessed by ACOSTA or someone that traveled near ACOSTA. Additionally, Your Affiant queried all Timing Advance data locations for (414) 397-2342 for the available dates January 20, 2023 – February 19, 2023, and found a cluster of location indicators for that device at or near the listed home address of Alfredo ACOSTA - 4323 South 110th Street, Greenfield, Wisconsin.

58.     There was no Timing Advance data recorded for (414) 397-2342 between 5:35AM – 7:08AM on February 19, 2023, which is consistent with that device being off during that time.  When the device was powered on at 7:08AM, the Timing Advance data showed it to be at or in the area of 4151 North 12th Street, Milwaukee, Wisconsin, which is the residence of Geo OWENS.  Alfredo ACOSTA was hospitalized at this time and did not possess the cellphone.

59.     A query of the call history for (414) 397-2342 showed that it had the most frequent contacts with (414) XXX-6964, which is a number associated with a C.H. per TLO. C.H.'s listed address is XXXX East Cudahy Avenue, Cudahy, Wisconsin.  The Timing Advance data for (414) 397-2342 showed that the device had multiple location indicators in the area of XXXX East Cudahy Avenue.  The device also showed to be within approximately .2 miles of XXXX East Cudahy Avenue after 7:08AM on February 19, 2023, and the phone received incoming calls from (414) XXX-6964 on the afternoon of February 19, 2023.  The records for (414) 397-2342 also showed that all incoming calls beginning at 9:01AM on February 19, 2023, went to voicemail.

60.     Your Affiant interviewed C.H. in an attempt of identify "Quis".  C.H. said the father of her children was Marquis HARRIS (DOB:1/23/1997) who had a current cellphone

21

number of (414) 779-7848, which was the most current contact number for "Quis" in MARCHENA'S iPhone.

61.     On July 6, 2023, ATF interviewed C.B. and C.B. provided the following:

62.     C.B. stated that ACOSTA had dropped off C.B., M.H., and the third male at the casino and then ACOSTA left the casino. C.B. said he recalled seeing a female in the car with ACOSTA at the casino at some point. C.B. could not recall where or when the female got into the car. C.B. said it was ACOSTA'S idea to go to the casino. Your Affiant showed C.B. a Milwaukee Police Department booking photograph of Marquis HARRIS (DOB:1/23/1997) and asked if C.B had ever met the person in the photograph. Upon seeing the photograph of HARRIS, C.B. immediately stated, "That's him!" C.B. further stated that HARRIS was the fourth unknown male that was with C.B., ACOSTA, and M.H. on the night of the robbery. C.B. said HARRIS was with him and M.H. at the casino. C.B. also said HARRIS went to the afterparty with C.B. and ACOSTA. C.B. further stated that HARRIS was in the front passenger seat of ACOSTA'S Chrysler 300 when ACOSTA first picked up C.B. and M.H. earlier that night at C.B.'s house before they went bar hopping together.

63.     Your Affiant asked C.B. how confident he was that HARRIS was the previously unknown male that accompanied the group all night (including to the casino and afterparty). C.B. said he was "very confident" that HARRIS was the guy with them all night. C.B. further said he had met HARRIS on previous occasions through ACOSTA and knew HARRIS' face, so he was very confident. C.B. stated he thought HARRIS looked like he was part Hispanic in person, but his photograph made him look more African American. C.B. said he recalled ACOSTA call HARRIS a name that sounded similar to "Reece".

22

64.     ATF specifically asked ACOSTA during his interview to identify the previously unknown third male who accompanied ACOSTA and C.B. to the afterparty and ACOSTA said he did not recall that a third person was with him and C.B.

65.     C.B. also volunteered that he had seen HARRIS on previous encounters hanging out with a local rap artist by the name "Global Star" or something similar to that name.  Your Affiant then showed C.B. a digital photograph of Geo OWENS from OWENS' Facebook page "Lilg Globaltrapstar".  C.B. identified OWENS as the rap artist who C.B. has seen hanging out with HARRIS.

66.     Your Affiant subsequently reviewed business records (to include call detail records, Timing Advance data, and cell tower data) previously provided by cellphone carriers (via legal process) to create a timeline summary of contacts and general locations of relevant cellphone devices related to the carjacking, abduction, shooting, and arson on February 19,2023. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

67.     Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data, Global Positioning Device ("GPS") data or Timing Advance Data. Based on my training and experience, Timing Advance data provided by T-Mobile has a GPS accuracy radius that ranges from approximately 100-300 meters.

23

68.     The following timeline summary is a revision of the pre-existing timelines as result of additional analysis of cellphone records and information obtained from interviews. Specifically, I believe that Alfredo ACOSTA was in possession of two cellphones on February 18-19, 2023.  In previous reports, Your Affiant believed ACOSTA possessed (414) 397-2342 on February 19, 2023.  However, an additional interview and cellphone data analysis has shown that (414) 397-2342 was likely possessed by Marquis HARRIS on that date and that cellphone may have traveled for a period of time with ACOSTA or near ACOSTA. Additionally, ATF received call detail records from Verizon regarding number (213) 474-6888 that revealed this number had numerous contacts with the mother of ACOSTA'S children.  Specifically, the mother of ACOSTA'S children called this number numerous times following the shooting which is consistent with ACOSTA stating that she called one of his phones after the shooting. Therefore, it is believed that (213) 474-6888 was possessed by ACOSTA on February 19, 2023.

69.     Information detailed in the subsequent timeline was derived from the following records:

- T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #12 and #28)

- AT&T records for (414) 526-1156, which is a cellphone number associated with Geo OWENS (ATF Item #24 and #25)

- Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29)

- T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect (ATF Item #27)

- T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26)

24

- Verizon records for (213) 474-6888, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #1* (ATF Item #51)

- Charter Communications records for (262) 283-2021, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #2* (ATF Item #23)

- T-Mobile records for cellphone tower dumps (ATF Item #10)

- T-Mobile records for (262) 402-0511, which is a cellphone number associated with C.B. (ATF Item #45)

- Surveillance video obtained near 3600 West Pierce Street (ATF Item #2)

- Interview of C.H.

- Search of MARCHENA'S iPhone (ATF Item #40) seized during search warrant.

70.     The following timeline is a summary and does not include all contacts or movements of the cellphone devices.

*All times are for February 18, 2023*

| | |
|---|---|
| 6:35PM | ACOSTA cellphone #1 called HARRIS cellphone. |
| 6:50PM | OWENS called HARRIS cellphone. |
| 7:05PM | ACOSTA cellphone #2 called C.B. for 459 seconds. |
| 7:11PM | OWENS and MARCHENA both attempted to call HARRIS cellphone. |
| 7:19PM | ACOSTA cellphone #1 called HARRIS cellphone. |
| 9:20PM | C.B. called ACOSTA cellphone #2. |
| 9:38PM | ACOSTA cellphone #2 called C.B. |

25

| | |
|---|---|
| 9:42PM | C.B. called ACOSTA cellphone #2. |
| 9:48PM | Timing Advance data for HARRIS' cellphone showed it arrived in the area of downtown Milwaukee and stayed in that general area until approximately 2:24M on 2/19/2023. |
| 11:16PM | OWENS called HARRIS' cellphone for 201 seconds. |
| 11:33PM-2:34AM | HARRIS' cellphone had multiple contacts with OWENS, MARCHENA, and ACOSTA cellphone #1. |

***All times are for February 19, 2023***

| | |
|---|---|
| 1:04AM | HARRIS' cellphone called ACOSTA cellphone #1. |
| 1:05AM | HARRIS' cellphone called ACOSTA cellphone #1. |
| 2:15AM | (414) 788-9051 called EVANS. |
| 2:34AM | HARRIS' cellphone called MARCHENA. |
| 2:43AM | (608) 728-3913 called ACOSTA cellphone #1. |
| 2:44AM | HARRIS' cellphone arrived at or near Potawatomi Casino according to Timing Advance data. |
| 2:48AM | HARRIS' cellphone arrived in the area of 1810 West Wisconsin Avenue according to Timing Advance data. |
| 2:54AM | Timing Advance data for EVANS' cellphone showed it in the area of 1810 West Wisconsin Avenue. |
| 2:55AM | OWENS called HARRIS' cellphone. |
| 2:56AM-2:59AM | ACOSTA cellphone #1 called C.B. 3-times. |
| 3:01AM | ACOSTA cellphone #2 called C.B. |

26

| | |
|---|---|
| 3:03AM | Timing Advance data for EVANS' cellphone showed it in the area of Potawatomi Casino and it stayed in the area of the casino until approximately 3:52AM. |
| 3:04AM | Timing Advance data for cellphone (414) 788-9051 showed it in the area of Potawatomi Casino until at least approximately 3:50AM. |
| 3:05AM | OWENS called HARRIS' cellphone while HARRIS' cellphone was at or near Potawatomi Casino in Milwaukee. |
| 3:05AM | (608) 728-3913 called ACOSTA cellphone #1 multiple times until 3:58AM. |
| 3:07AM | HARRIS' cellphone left the area of Potawatomi Casino and arrived back near 1810 West Wisconsin Avenue. |
| 3:25AM | HARRIS' cellphone called ACOSTA cellphone #2 while HARRIS' cellphone was at or near 1810 West Wisconsin Avenue. |
| 3:26AM | HARRIS' cellphone called ACOSTA cellphone #2 while HARRIS' cellphone was at or near 1810 West Wisconsin Avenue. |
| 3:29AM | OWENS called ACOSTA cellphone #1. |
| 3:30AM | HARRIS' cellphone called OWENS for over 6 minutes while HARRIS' cellphone was at or near 1810 West Wisconsin Avenue. |
| 3:32AM | C.B. called ACOSTA cellphone #2. |
| 3:33AM | OWENS called MARCHENA for over 4 minutes in an apparent 3-way call with HARRIS' cellphone while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 3:37AM | HARRIS' cellphone called ACOSTA cellphone #2 while HARRIS' cellphone was at or near 1810 West Wisconsin Avenue. |

27

| | |
|---|---|
| 3:37AM | HARRIS' cellphone called ACOSTA cellphone #1 while HARRIS' cellphone was at or near 1810 West Wisconsin Avenue. |
| 3:37AM | ACOSTA cellphone #1 called OWENS for 76 seconds. |
| 3:41AM | C.B., M.H., and HARRIS were on video at Potawatomi Casino. |
| 3:41AM | OWENS called MARCHENA for 208 seconds while MARCHENA utilized a cell tower and sector that provide coverage for an area that included Potawatomi Casino. |
| 3:45AM | OWENS called ACOSTA cellphone #1. |
| 3:46AM | MARCHENA called HARRIS' cellphone. |
| 3:47AM | MARCHENA called OWENS while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 3:48AM | OWENS called ACOSTA cellphone #1. |
| 3:51AM | HARRIS' cellphone called ACOSTA cellphone #2. |
| 3:51AM | OWENS called ACOSTA cellphone #1. |
| 3:55AM | HARRIS' cellphone left the area of 1810 West Wisconsin Avenue and arrived in the area of Potawatomi Casino. |
| 3:56AM | OWENS called MARCHENA while MARCHENA utilized a cell tower and sector that provided coverage for an area that included South 18th Street and West Mineral Street. |
| 3:57AM | Potawatomi Casino surveillance cameras captured the Chrysler 300 driven by ACOSTA exit the casino parking structure and travel southbound. |
| 3:57AM | Timing Advance data for EVANS' cellphone and cellphone (414) 788-9051 showed those two devices in the area of South 17th Street and West Mineral Street, near the C.B. residence. |

28

| | |
|---|---|
| 3:58AM | HARRIS' cellphone had left the area of Potawatomi Casino and had traveled south. |
| 4:00AM-4:23AM | HARRIS' cellphone had 17 contacts with OWENS and MARCHENA, and only with OWENS and MARCHENA. |
| 4:03AM | ACOSTA cellphone #2 called ACOSTA cellphone #1 for 8 seconds. |
| 4:04AM | ACOSTA cellphone #1 called an unknown person at (608) 728-3913 for 50 seconds. |
| 4:11AM | ACOSTA cellphone #1 called an unknown person at (608) 728-3913 for 45 seconds. |
| 4:16AM | OWENS called MARCHENA while MARCHENA utilized a cell tower and sector that provide coverage for an area that included 3600 West Pierce Street. |
| 4:17AM | Surveillance video near 3600 West Pierce Street captured images of a white Jeep SUV travel eastbound on West Pierce Street. |
| 4:17AM | T-Mobile Timing Advance data showed EVANS' cellphone, as well as (414) 788-9051, were in close proximity to 3600 West Pierce Street at this time and then both devices subsequently traveled east. |
| 4:22AM | ACOSTA cellphone #1 called (608) 728-3913 for 10 seconds – the last outgoing call for ACOSTA cellphone #1. |
| 4:23AM-4:26AM | HARRIS' cellphone had 5 contacts with ACOSTA cellphone #2 while HARRIS' cellphone was in the area of West National Avenue and South 21st Street. |
| 4:33AM | T-Mobile Timing Advance data showed HARRIS' cellphone had traveled west from West National Avenue and South 21st Street. |

29

| 4:33AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included 3600 West Pierce Street. |
| --- | --- |
| 4:36AM | Surveillance video near 3600 West Pierce Street captured the arrival of the 2020 Chrysler 300 that was driven by Alfredo ACOSTA and also occupied by C.B. and HARRIS. |
| 4:36AM | Timing Advance data showed that HARRIS' cellphone arrived near 3600 West Pierce Street and stayed in that area until approximately 5:19AM. |
| 4:38AM | Surveillance video captured the three occupants of the 2020 Chrysler 300 enter 3600 West Pierce Street. |
| 4:40AM | OWENS called HARRIS' cellphone for 75 seconds. |
| 4:42AM | OWENS called MARCHENA while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 4:43AM-4:46AM | Surveillance video captured a white Jeep SUV travel by 3600 West Pierce Street on three separate occasions. |
| 4:43AM | OWENS called an unknown person at (773) 640-3853 for over 14 minutes. |
| 4:54AM | Surveillance video captured images of a white Jeep SUV parked in the alley immediately east of 3600 West Pierce Street. |
| 4:54AM-5:19AM | Timing Advance data showed EVANS' cellphone and (414) 788-9051 were in close proximity of 3600 West Pierce Street. |
| 4:57 AM | OWENS called HARRIS' cellphone while that number was at or near 3600 West Pierce and OWENS was utilizing a cell tower located at 3950 North Holton Street, Milwaukee which was over 7 miles northeast of 3600 West Pierce Street. |

*There is no activity on HARRIS' cellphone from 4:57AM – 9:01AM*

30

| 4:57:56AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
|---|---|
| 5:09AM | ACOSTA cellphone #1 called (414) 400-8443, which is a number that was assigned IMSI #310260265833244, and whose Timing Advance data placed its approximate location at or near 3600 West Pierce Street from at least 4:36AM until approximately 5:25AM. |
| 5:17AM | Surveillance video captured images of ACOSTA, C.B., and HARRIS exit 3600 West Pierce Street. The three males walked toward the Chrysler 300 and ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video further showed C.B., and ACOSTA were ushered by the suspects into the white Jeep SUV while HARRIS appeared to be placed in the Chrysler 300 along with one suspect from the white Jeep SUV. |
| 5:19AM | Surveillance video captured images of the white Jeep SUV and the Chrysler 300 travel southbound on South 36th Street and out of frame. |
| 5:19AM | Timing Advance data for EVANS, HARRIS' cellphone, and (414) 788-9051 showed that all three devices traveled away from 3600 West Pierce Street at this time. |
| 5:21AM | Timing Advance data showed that HARRIS' cellphone was in the area of 35th Street and I-94. |
| 5:21AM | Timing Advance data for EVANS' cellphone showed that this device was in the area of North 41st Street and I-94, Milwaukee. |
| 5:22AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included I-94 immediately north of American Family Field and while (414) 788-9051 was also in that same general area. |

31

| | |
|---|---|
| 5:23:17AM | OWENS called MARCHENA while OWENS utilized a cellphone tower located at 3950 North Holton Street and MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included North 37th Street and North Avenue. |
| 5:23:56AM | (414) 788-9051 called OWENS while OWENS utilized a cellphone tower located at 3950 North Holton Street and (414) 788-9051 was located near North 38th Street and North Avenue. |
| 5:24AM | Timing Advance data showed that HARRIS' cellphone was near North 37th Street and North Avenue. |
| 5:24AM | Timing Advance data showed that EVANS' cellphone was near North 37th Street and North Avenue. |
| 5:28AM | Timing Advance data showed that HARRIS' cellphone was near Virginia Street and South 6th Street. |
| 5:28AM | Timing Advance data showed that EVANS' cellphone was near Virginia Street and South 6th Street. |
| 5:30AM | OWENS called MARCHENA while OWENS utilized a cellphone tower located at 2325 North 50th Street. |
| 5:31AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower that provided coverage to an area that included I-894 and (414) 788-9051 utilized a cellphone tower and sector that provided coverage to an area that included 1727 West Mineral Street. |
| 5:32AM-5:36AM | Timing Advance data showed that EVANS' cellphone was in the area of South 24th Street and Lapham Street, which was less than 1 mile southwest of 1727 West Mineral Street. |
| 5:33AM | Timing Advance data showed that HARRIS' cellphone was near the shooting scene at 1727 West Mineral Street. |

32

| | |
|---|---|
| 5:34AM | OWENS called (414) 788-9051 while OWENS utilized a cellphone tower and sector that provided coverage for an area that included 1727 West Mineral Street. |
| 5:35AM | Timing Advance data showed that HARRIS' cellphone was near 1727 West Mineral Street. There was no Timing Advance data available again for this number until 7:08AM, which is consistent with the device being turned off. |
| 5:38AM | (414) 788-9051 called OWENS while OWENS utilized a cellphone tower that provided coverage to an area that included 1727 West Mineral Street and (414) 788-9051 appeared to be mobile as it was located near 16th Street and Canal at the beginning of the call and near North 36th Street and Llyod Street at the end of the call. |
| 5:38AM | Timing Advance data showed that EVANS' cellphone was in the area of North 25th Street and St. Paul Avenue, which was less than 1.5 miles northwest of 1727 West Mineral Street. |
| 5:42AM | (414) 788-9051 called MARCHENA. |
| 5:43AM | 911 call for shooting near 1727 West Mineral Street – C.B. and ACOSTA fled from the white Jeep SUV near this location. |
| 6:14AM | (414) 788-9051 called MARCHENA. |
| 6:29AM | (414) 788-9051 called EVANS. |
| 6:31AM | (414) 788-9051 called MARCHENA. |
| 6:32AM | MARCHENA called (414) 788-9051. |
| 6:35AM | MARCHENA called (414) 788-9051. |
| 6:37AM | OWENS called EVANS while EVANS was located near North Oakland Avenue and East Kenmore Place and OWENS utilized a cellphone tower located at 3950 North Holton Street, which was less than 1.5 miles northeast of 227 East Townsend Street. |

33

| 6:45AM | 911 call for vehicle fire at 227 East Townsend in Milwaukee – 2020 Chrysler 300 that had been stolen from ACOSTA at 3600 West Pierce. |
|---|---|
| 7:08AM | HARRIS' cellphone Timing Advance data showed it was at or near Geo OWENS' residence. |
| 7:55AM | According to Timing Advance data, HARRIS' cellphone arrived in the area of XXXX East Cudahy Avenue, Cudahy, WI, which is a location previously frequented by this number on prior dates. |
| 9:01AM | OWENS called HARRIS' cellphone while HARRIS' cellphone was at or near XXXX East Cudahy Avenue, Cudahy, WI. |
| 9:52AM | C.H. cellphone was used to call OWENS. |
| 9:54AM | OWENS called C.H. cellphone for 2:56 minutes. |

71.    Based on the above timeline, I believe OWENS played a role in coordinating the carjacking on February 19, 2023, and subsequent crimes, and OWEN'S knowledge and participation is supported by his cellphone's movement to the area of the shooting after the carjacking.  I also believe the HARRIS and ACOSTA likely had prior knowledge of the carjacking and robbery based on the phone contacts with the people who appeared in the areas of the casino, the carjacking location, and the shooting location.  I believe that HARRIS was associated with OWENS, MARCHENA, EVANS, and the possessor of (414) 788-9051 because all of those numbers were in the call detail records for HARRIS.  The timing and sequence of calls, and the general locations of devices at critical times leads Your Affiant to believe there was a conspiracy to conduct the carjacking and subsequent crimes on February 19, 2023, amongst the following persons and others: Geo OWENS, Jhony MARCHENA, Kentreal EVANS, the possessor of (414) 788-9051, Alfredo ACOSTA, and Marquis HARRIS.  I further

34

believe that ACOSTA appeared to have traveled with HARRIS' cellphone while HARRIS was at the casino.   The conspirators' crimes include violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 18 U.S.C. §§ 371 (conspiracy).

72.     On July 25, 2023, ATF received records from Apple Incorporated regarding the following devices pursuant to a federal subpoena:

73.     According to Apple records, IMEI #352853884789914 is associated with iCloud account john.garcia33@icloud.com. T-Mobile records associated this IMEI number to cellphone number (414) 397-2342, which is a number associated with Marquis HARRIS.

74.     According to Apple records, IMEI #353060103038680 is associated with iCloud account nikaalola@icloud.com. T-Mobile records associated this IMEI number to cellphone number (414) 788-9051, which is a number associated with an unknown co-conspirator.

75.     According to Apple records, IMEI #350559894033688 is associated with iCloud account kentreal48@icloud.com and kentreal.evans48@icloud.com. T-Mobile records associated this IMEI number to cellphone number (414) 975-7826, which is a number associated with Kentreal EVANS.

76.     According to Apple records, IMEI #358677234596800 is associated with iCloud account ljames22356@icloud.com. Verizon records associated this IMEI number to cellphone number (414) 309-9038, which is a number associated with Jhony MARCHENA.

77. According to Apple records, IMEI #352563743582141 is associated with iCloud account joel.a4@icloud.com. Verizon records associated this IMEI number to cellphone number (213) 474-6888, which is a number associated with Alfredo ACOSTA.

78. On August 3, 2023, ATF received records from Apple Incorporated regarding two devices pursuant to a federal subpoena. The federal subpoena had requested data related to the following IMEI numbers: #35708434087093 and #35695570874736. According to Apple records, IMEI #35708434087093 is associated with iCloud account only1music@gmail.com. AT&T records associated this IMEI number to cellphone number (414) 526-1156. Apple records further showed that this IMEI number and Apple account subscriber was Geo OWENS at 4151 North 12th Street, Milwaukee, Wisconsin. According to Apple records, IMEI #35695570874736 is associated with iCloud account fredoa26@icloud.com. Apple records further showed this IMEI and account number to be registered to Alfredo ACOSTA at 4323 South 110th Street, Greenfield, Wisconsin; and associated with phone number (262) 283-2021.

79. The following is a summary of the recorded calls placed by MARCHENA from July 31, 2023 – August 7, 2023:

80. On July 31, 2023, at 8:04PM, MARCHENA placed a recorded call to a female at (404) 825-3674, which is a number associated with Gisell Matus according to Inmate Solutions payment history. MARCHENA asked Matus if "Geo" has sent her something. Matus stated that Geo had texted her that morning and told her that Ibree was going to get back to Matus and that Matus should be patient. Matus also said that Fred told her to put "six" into her account. MARCHENA asked why that amount had been selected. Matus responded that "he" told her to put "3" in each account, but that she still hadn't been given a set amount. Matus further said she had tried to log into the "thing", but "he" has the login. Matus told MARCHENA that she didn't

36

know what to do.  MARCHENA responded, "I'm going to call Geo and see what he's talking about?"  Matus said that Geo told her to tell MARCHENA to stop talking about it over the phone.  MARCHENA told Matus to wait until "Fred" gave her the loan to see how much it was and then see what Ibree had to say.  Matus informed MARCHENA that Fred was going to give her the paperwork that she needed to submit.  Matus further said she had opened a bank account.

81.     On August 1, 2023, at 7:49PM, MARCHENA called Matus at (404) 825-3674. Matus said she was irritated at "Gee" because he is "tripping".  Matus said that Gee/Geo wanted to find out why Fred was having Matus do things that Geo didn't have to do.  Matus said she had done everything that had been asked of her by MARCHENA and Geo and now the account was at negative 30,000.  Matus said that Fred told her to put that "shit" into my account instead of the "payments" or else that it would go on her credit.  Matus further said that Geo wanted to keep "stalling" and that is why Matus "didn't want to do this" to begin with.  Matus reminded MARCHENA that they had a baby on the way.  MARCHENA insisted that he would call Geo. Matus said she had texted Geo asking him what the word was.  Matus said Geo told her that Fred hadn't called Geo yet.  Matus also said that Geo told her that she didn't have to pay "all that" before she got preapproved.  Matus stated that Fred told her to put "6" in a separate bank account before he has the IRS send her a separate letter.  Matus said she sent a screenshot of Fred's instructions to Geo.  Matus said Fred told her to text him and let Fred know when she opens a bank account and put $6,000 into it.  Matus also said Fred asked for her social security number and other information.  MARCHENA said he would call Geo.  Matus said that if (the money) sits right there without payments, then the IRS is going to say she owes $30,000.  Matus asked MARCHENA if he was using Geo's money to "get this crib" and MARCHENA said no.  Matus

then asked why Geo was acting the way he is acting. Matus also said she had texted "everything" to Ibree.

82. On August 2, 2023, at 3:41PM, MARCHENA placed a recorded call to OWENS at (305) 342-6049. During that recorded call, MARCHENA explained to OWENS that a female was worried about taking out an apparent loan because she couldn't afford the payment. OWENS informed MARCHENA that the female just needed to make modest payments and that OWENS would give her $500-$1000 month towards those payments. OWENS also said nothing would happen to the female if she didn't make payments. MARCHENA said the female was worried about her credit. OWENS said he had been texting the female earlier that same day. MARCHENA further stated that he was going to have his mother and another female do the same thing so that he could have multiple "cribs" himself.

83. On August 3, 2023, at 2:20PM, MARCHENA called Matus at (404) 825-3674. MARCHENA told Matus that Geo had texted her. Matus said that Geo had not texted her. Matus further said that Geo was acting like it's not "already filed" but it was filed. MARCHENA asked Matus why she had to meet with Fred the next day. Matus said she needed to show Fred the bank account and to give him his money and to set up the payments. MARCHENA said that Geo was asking why Fred needed to meet her. Matus later became upset because "now that it's the next step" everyone was acting stupid and Matus regretted doing "it". Matus said that if Fred hadn't already filed the taxes then she would have backed out. Matus reminded MARCHENA that they have a child coming and stated, "Do you know what fucking with the IRS how much that can fuck up?..."

84.     On August 4, 2023, at 1:42PM, MARCHENA called Matus at (404) 825-3774. Matus said that Geo was acting like he screwed up or spent money on something. Matus was upset that Geo was not calling her or texting her.

85.     On August 4, 2023, at 7:25PM, MARCHENA called OWENS at (305) 342-6049. MARCHENA told OWENS that MARCHENA'S girl was unhappy. MARCHENA told OWENS that Matus had texted Ibree. OWENS told MARCHENA that Ibree didn't know what Fred was doing. OWENS later said that MARCHENA would be able to "pay her" to buy a house but that there wouldn't be much left over to "bust" a "move". OWENS questioned why Matus needed to meet Fred at all because Matus had claimed she had paid Fred after Geo had given her $7,000.

86.     Furthermore, I know from training and experience that Facebook has the ability to capture location data when the Facebook application is open and certain features are enabled by its user. ACOSTA stated during his recorded ATF interview that his Facebook page was open at the time the carjackers took his cellphone from his person on February 19, 2023.

## FACEBOOK INFORMATION

87.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39

88.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addressees, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

89.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

90.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

91.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available

elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

92.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

93.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

94.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

95.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

41

96.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

97.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

98.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

99.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

100.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

101.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

102.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may

42

communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

103. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide

43

relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

104.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

105.     Based on the forgoing, I request that the Court issue the proposed search warrant and I submit that this Affidavit supports probable cause for a search warrant authorizing the search of the Facebook account belonging to Alfredo ACOSTA further described in Attachment A for the items of evidence described in Attachment B.

106.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

44

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information between January 1, 2022, and Present Date, associated with the Facebook vanity name "Alfredo Acosta" with Facebook ID ##100004126687957 that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a social networking company headquartered in Menlo Park, California.

1

## ATTACHMENT B
## Particular Things to be Seized

**I.    Information to be disclosed by Meta Platforms, Inc.**

1.      To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

   a. All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

   d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

   e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

2

f.   All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All audio messages sent by the account and messages received by the account;

m.   All video messages sent by the account and to the account;

n.   Any and all location data that is recorded by Facebook related to the account;

o.   All information about the user's access and use of Facebook Marketplace;

p.   The types of service utilized by the user;

q.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s.   All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

1.   All information described above that constitutes fruits, evidence, and instrumentalities of violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 18 U.S.C. §§ 371 (conspiracy).

3

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b. Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

c. Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

4

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Meta (Facebook), and my

official title is _____.  I am a custodian of records for Meta

(Facebook).  I state that each of the records attached hereto is the original record or a true

duplicate of the original record in the custody of Facebook, and that I am the custodian of the

attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of Facebook; and

c.      such records were made by Meta (Facebook) as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____          _____
Date                             Signature

1

❒ Original      ❒ I

**CLERK'S OFFICE**
**A TRUE COPY**
Aug 16, 2023
s/ D. Olszewski

**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.   23    MJ    140 |
| Information associated with Facebook ID: | ) |
| 100004126687957, as further described in | ) |
| Attachment A | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     8/30/2023     *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. William E. Duffin     .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:     8/16/2023 at 11:11 AM          *William E. Duffin*
                                                          *Judge's signature*

City and state:   Milwaukee, WI                    Honorable William E. Duffin, U.S. Magistrate Judge
                                                          *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information between January 1, 2022, and Present Date, associated with the Facebook vanity name "Alfredo Acosta" with Facebook ID ##100004126687957 that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a social networking company headquartered in Menlo Park, California.

1

## **ATTACHMENT B**
## **Particular Things to be Seized**

### I. **Information to be disclosed by Meta Platforms, Inc.**

1.      To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

   a. All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

   d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

   e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

2

f.   All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All audio messages sent by the account and messages received by the account;

m.   All video messages sent by the account and to the account;

n.   Any and all location data that is recorded by Facebook related to the account;

o.   All information about the user's access and use of Facebook Marketplace;

p.   The types of service utilized by the user;

q.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s.   All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

1.   All information described above that constitutes fruits, evidence, and instrumentalities of violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 18 U.S.C. §§ 371 (conspiracy).

3

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b. Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

c. Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.